**Maeve McGRATH–MALOTT, Plaintiff,**

v.

**State of MARYLAND, et al., Defendants.**

**Civil Action No. RDB–06–879.**

United States District Court, D. Maryland.

June 23, 2008.

Francis J. Collins, Kahn Smith and Collins PA, Baltimore, MD, for Plaintiff.

Elissa Doe Levan, Office of the Attorney General of Maryland, James A. Johnson, Jonathan R. Topazian, Christopher J.

Lyon, Semmes Bowen and Semmes PC, Baltimore, MD, for Defendants.

## *MEMORANDUM OPINION*

RICHARD D. BENNETT, District Judge.

In this employment discrimination case, Maeve McGrath–Malott ("Plaintiff" or "McGrath–Malott"), formerly a Deputy Sheriff for Washington County, Maryland, alleges that the State of Maryland ("the State"), Charles F. Mades ("Mades"), the former Sheriff of Washington County, in his individual and official capacities, and Douglas W. Mullendore ("Sheriff Mullendore"), current Sheriff of Washington County, in his official capacity, discriminated and retaliated against her on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et. seq.*, and 42 U.S.C. § 1983.[1] Pending before this Court are two motions: Charles Mades's Motion for Summary Judgment (Paper No. 64) and a joint Motion for Summary Judgment filed by the State and Sheriff Mullendore (Paper No. 65). For the following reasons, Mades's Motion for Summary Judgment on Count III is DENIED. The State's and Sheriff Mullendore's Motion for Summary Judgment is GRANTED in part as to the discriminatory failure to promote claim in Count I but is DENIED in part as to all remaining claims in Counts I and II.

## *BACKGROUND*

The facts are viewed in a light most favorable to the Plaintiff. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted).

Maeve McGrath–Malott worked as a Deputy Sheriff in the Sheriff's Office for Washington County, Maryland ("Sheriff's Office"), from January 15, 1990, to October 28, 2003. (McGrath–Malott Aff. ¶¶ 2, 33.) Upon her arrival, McGrath–Malott was warned by at least one female colleague that Sheriff Charles Mades ("Mades") had a reputation for exhibiting "negative and discriminatory . . . behavior" towards women. (*Id.* ¶ 4.)

During her first two years in the Judicial Division of the Sheriff's Office, McGrath–Malott was disciplined for two separate occasions: serving a warrant by herself and for using vacation leave time to attend law enforcement training. (*Id.* ¶¶ 5–6.) Both times, the discipline forms were removed from her personnel file after she pointed out that no male deputies had ever received disciplinary action for engaging in the same activities. (*Id.*) Shortly after the second incident, in the summer of 1991, McGrath–Malott's request to be transferred to the Road Patrol Division was granted, where she became the first woman to serve as a road patrol deputy in Washington County. (*Id.* ¶ 7.) In her two years with the Road Patrol Division, McGrath–Malott received generally good performance evaluations. (*Id.* ¶ 8.)

In 1994, McGrath–Malott was transferred back to the Judicial Division to serve summons as part of a special child support enforcement program. (*Id.* ¶ 9.) Her "statistics were consistently higher" than those of her colleague, Deputy First Class Paul Boyer ("Dfc. Boyer"), except for a period of time when she was on sick leave. (*Id.*) In fact, McGrath–Malott fre-

---

**1.** McGrath–Malott originally brought this action against two additional Defendants, the Washington County Sheriff's Office and Board of County Commissioners of Washing-
ton County. However, both parties were dismissed from this action by this Court on February 23, 2007, 2007 WL 609909, (Paper No. 35).

quently "received the annual award for most warrants served." (*Id.* ¶ 10.) In 1994, she was also asked by Lieutenant Robert Hafer ("Lt. Hafer") to attend the Secret Service Firearms Instructor course to become a firearms instructor for the Sheriff's Office. (*Id.* ¶ 12.)

From 1994 to 2001, McGrath–Malott claims she was subject to "derogatory discriminatory sexist remarks and sexual harassment" by both Mades and Lt. Hafer. (*Id.* ¶ 13.) For example, McGrath–Malott was ordered to chauffeur Mades to a Christmas party, Mades made comments about wanting to "fool around" with her and "grab [her] tits," Mades mentioned that his wife made him wear a chastity belt before getting in a car with McGrath–Malott, and Lt. Hafer frequently commented on her breast size and inquired about her sexual activity. (*Id.*) In addition, Mades commented that he did not think women should be promoted because they were, in his experience as a state trooper, often unqualified, and Mades later made derogatory remarks about McGrath–Malott's goal to attend law school. · (*Id.* ¶ 14.) The most blatant event, McGrath–Malott contends, was at a May 22, 1998 dinner event when Mades put his hand up her shirt and attempted to touch her breasts while asking if she wanted to touch him. (*Id.* ¶ 13.)

In 2000, McGrath–Malott's mother was diagnosed with terminal lung cancer. (*Id.* ¶ 15.) On June 7, 2000, she asked Mades permission to seek donations of leave time to care for her mother but Mades refused, even though male colleagues had been permitted to seek donations in the past. (*Id.*) When McGrath–Malott brought this to Lt. Mullendore'[2] attention the next day, her request was granted. (*Id.*)

In 2001, both McGrath–Malott and Dfc. Boyer were transferred to the Patrol Division but continued to work under the Child Support Enforcement Unit. (*Id.* ¶ 11.) In May of 2002, McGrath–Malott, along with three other male deputy sheriffs including Dfc. Boyer, applied to be Corporal of the Judicial Division. (*Id.* ¶ 29.) Captain Douglas Mullendore, now Sheriff, wrote, administered, and graded the examinations that were part of the selection process. (*Id.*) Dfc. Boyer scored highest of the four applicants with 91.41 points, McGrath–Malott scored in second place with 89.91 points, and the third- and fourth-place applicants—both men—scored 76.88 and 73.29 points, respectively. (Defs.' Mem. Supp. Summ. J. Ex. 4.) Captain Mullendore announced that Dfc. Boyer received the promotion in December of 2002 while McGrath–Malott was on sick leave to care for her mother, as discussed *infra.* (McGrath–Malott Aff. ¶ 29.) When McGrath–Malott returned to work in January of 2003 and requested to see the exam results, Captain Mullendore said they had been destroyed but that Dfc. Boyer had scored "a fraction of a point higher." (*Id.*) The examination results were not destroyed, however, and in fact have been submitted as Exhibit # 4 to the State's and Mades's Memorandum in support of their Motion for Summary Judgment.

In November of 2002, her mother's health deteriorated and McGrath–Malott had to use sick leave to care for her. (*Id.* ¶ 16.) The warrant unit of which McGrath–Malott was a part agreed to serve her share of summons and warrants while she was on sick leave. (*Id.*) Dfc. William Malott served the majority of McGrath–Malott's summonses in her ab-

---

**2.** It is assumed that "Lt. Mullendore" is Defendant Douglas Mullendore, the current Sheriff of Washington County.

sence. (*Id.*) After her mother passed away in mid-December 2002, McGrath–Malott returned to work on January 5, 2003. (*Id.* ¶ 17.) In March of 2003, her brother was involved in a serious car accident, and she had to use two additional weeks of sick leave to care for him. (*Id.*) Twelve of the weeks McGrath–Malott took off were approved by Washington County under the Family Medical Leave Act ("FMLA"). (*Id.* ¶ 21.) At no time did anyone from the Sheriff's Office or Washington County mentioned any concerns to McGrath–Malott about her usage of sick leave or leave taken under the FMLA. (*Id.* ¶¶ 17–18.)

On April 22, 2003, Mades transferred McGrath–Malott from the child support enforcement division to courtroom duty in the Judicial division against her wishes, supposedly because of her sick leave usage. (*Id.* ¶ 19.) She went to Mades's office to drop off a written request that her transfer be delayed until she completed her exams for that semester of law school, but he was on the phone. While she waited in the door, in full view, Mades made a derogatory remark to the person on the other end of the phone about McGrath–Malott's use of sick leave to care for her mother and added that "the only thing worse than a lawyer was someone studying to be one." (*Id.* ¶ 20.) McGrath–Malott left Mades's office and submitted the request to Captain Mullendore instead, to give to Mades. (*Id.*) In light of her "emotional frailty" following the death of her mother, her brother's accident, and the events at work, McGrath–Malott's therapist recommended that she take some sick leave beginning April 28, 2003. (*Id.*) In July of 2003, McGrath–Malott filed a workers compensation claim, which she subsequently withdrew after learning that she was not eligible for short-term disability benefits while the workers compensation claim was pending. (Defs.' Mem. Supp. Summ. J. Exs. 14–15.) On August 22, 2003, Washington County approved McGrath–Malott's sick leave as covered by the FMLA, but she was also notified that her FMLA leave was exhausted. (*Id.* ¶ 24.)

As this Court noted in its February 23, 2007 Memorandum Opinion (Paper No. 34), on July 25, 2003, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against the Washington County Sheriff's Office alleging that Mades had discriminated against her on the basis of her sex. Notice of this Charge was also sent to Mades. In August of 2003, the EEOC issued a right to sue letter to McGrath–Malott indicating that the agency could not determine whether any illegal conduct had taken place.

On September 17, 2003, McGrath–Malott sent a letter to U.S. Senator Barbara Mikulski and then-U.S. Senator Paul Sarbanes apprising them of the discrimination she was allegedly facing at the Sheriff's Office. (Compl. Ex. D.) She also sent communications to the Governor and Attorney General of Maryland. (*Id.* ¶ 23.)

Also on September 17, 2003, McGrath–Malott requested in writing that Mades give her a temporary modified work assignment, attaching a letter from her physician, Dr. Terri Sears–Nickens, recommending that she be placed on "light duty." (*Id.* ¶ 33; Compl. Ex. A.) On September 24, 2003, Ronald Pike, a licensed social worker who had been treating McGrath–Malott, submitted a report recommending that she be placed on light duty for four to six weeks after which she could be reevaluated to return to "unrestricted work assignment." (Compl. Ex. F.)

On October 6, 2003, a meeting was held to address McGrath–Malott's request for a modified work assignment. (*See* Pl.'s Mem. Opp'n Summ. J. Ex. 6.) In attend-

ance were Mades, Delores (Dee) Hawbacker, the Human Resources Administrator for the County, Dr. Sears–Nickens, and. (*Id.*) Dr. Sears–Nickens and Mr. Pike cleared McGrath–Malott to return to work with a few weeks of "light duty." (McGrath–Malott Aff. ¶ 34; Pike Dep: 62:8–15.) They also believed that McGrath–Malott would "return to full state of functioning." (Pl.'s Mem. Opp'n Summ. J. Ex. 6, at p. 3.) After the meeting, Dee Hawbacker noted in her summary that she "wish[ed] [McGrath–Malott] would have handled [her mother's death] on a personal illness nature and not have gone the routes of filing EEOC/Workers Compensation claims implicating her work environment as the cause of her distress and numerous hours spent and legal costs associated with questioning every subject matter." (*Id.*)

On October 15, 2003, Mades denied McGrath–Malott's request for a modified work assignment, reasoning primarily that her doctors were unable to set a specific time after which she could return to a full-duty schedule and she would pose a risk to the public safety by working under mental stress. (Compl. Ex. E.) On October 28, 2003, McGrath–Malott was fired. (McGrath–Malott Aff. ¶ 33.) The letter of termination stated that she had exhausted all vacation, sick, and FMLA leave and that the Sheriff had "not received any indication when, if ever, [she would] be able to perform the essential functions of a law enforcement officer." (Compl. Ex. B.) McGrath–Malott disputes that conclusion.

On January 13, 2005, McGrath–Malott filed an amended EEOC Charge of Discrimination again alleging violations of Title VII for sex discrimination, but adding that the violations were "continuing." The last incident of discrimination listed was her discharge on October 28, 2003. On May 31, 2005, the EEOC determined that there was "reasonable cause to believe" that the Sheriff's Office had violated Title VII. (Compl. Ex. C.) McGrath–Malott received written notice from the EEOC on January 9, 2006, that the agency was unable to reach a resolution with the Sheriff's Office and that the United States Department of Justice would not pursue legal action.

McGrath–Malott filed the instant suit in this Court on April 5, 2006, against the State of Maryland, the Board of County. Commissioners of Washington County, Maryland, the Washington County Sheriff's Office, and Charles Mades, both in his individual and official capacities. Douglas Mullendore was added as a Defendant when he replaced Mades as Sheriff for Washington County. Count I of the Complaint alleges sex discrimination in violation of Title VII, Count II alleges retaliation in violation of Title VII, Count III alleges violations of 42 U.S.C. § 1983, Count IV alleges violations of the Maryland Declaration of Rights, and Count V alleges abusive discharge under Maryland common law.

On May 26, 2006, Defendant Board of County Commissioners of Washington County filed a Motion to Dismiss and for Summary Judgment (Paper No. 12) which was amended on May 30, 2006 (Paper No. 16). Defendant State of Maryland filed a Motion to Dismiss or, Alternatively, for Summary Judgment on June 14, 2006 (Paper No. 18). Finally, Defendant Charles Mades filed a Motion to Dismiss in Part and for Partial Summary Judgment on June 19, 2006 (Paper No. 21) on all counts except Count III. On February 23, 2007, by Memorandum Opinion (Paper No. 34) and Order (Paper No. 35), this Court dismissed the Washington County Sheriff's Office, on the grounds that it is not a legal entity, and the Board of County Commissioners of Washington County, on the

grounds that Sheriff Mades and McGrath–Malott were employees of the State of Maryland not Washington County. This Court granted Mades's motion with respect to Counts I and II in his personal capacity on the grounds that the State, not he, was McGrath–Malott's employer within the meaning of Title VII. This Court granted the State of Maryland's motion as to Count III on the grounds that the State is not a "person" within the meaning of section 1983. Finally, this Court granted both Maryland's and Mades's motions as to the state law claims in Counts IV and V on the grounds that they were immune under the Eleventh Amendment of the United States Constitution, but denied both motions as to Counts I and II finding genuine issues of material fact as to the Title VII claims.

The remaining claims are: Count I (Title VII gender discrimination) against the State of Maryland and Sheriff Mullendore in his official capacity; Count II (Title VII retaliation) against the State of Maryland and Sheriff Mullendore in his official capacity; and Count III (against Mades in his individual capacity).[3] On November 13, 2007, Defendant Charles Mades filed a Motion for Summary Judgment as to Count III—the sole claim against him under section 1983. (Paper No. 64.) On November 14, 2007, Defendants Douglas Mullendore and the State of Maryland jointly filed a Motion for Summary Judgment as to Counts I and II—the only two claims pending against them. (Paper No. 65.)

---

**3.** Although Mades did not move for dismissal or summary judgment as to Count III in his official capacity, Plaintiff concedes that there is no such claim pending. (*See* Pl.'s Mem. Opp'n Summ. J. 2.) Furthermore, it is well-established that "neither a State nor its officials acting in their official capacities are

## STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. *Nat'l City Bank of Indiana v. Turnbaugh*, 463 F.3d 325, 329 (4th Cir.2006). In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252, 106 S.Ct. 2505.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir.2005). However, the opponent must bring forth evidence upon which a

---

'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Thus, neither Mades nor Sheriff Mullendore can be held liable under section 1983 in Count III in their official capacities.

reasonable fact finder could rely. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Once the movant has established the absence of any genuine issue of material fact, the opposing party has an obligation to present some type of evidence to the court demonstrating the existence of an issue of fact." *Pension Ben. Guar. Corp. v. Beverley,* 404 F.3d 243, 246–47 (4th Cir.2005) (citing *Pine Ridge Coal Co. v. Local 8377, UMW,* 187 F.3d 415, 422 (4th Cir.1999)).

## ANALYSIS

### I. Charles Mades's Motion for Summary Judgment

Only Count III remains pending against Defendant Charles Mades in his personal capacity. In Count III, brought pursuant to section 1983, Plaintiff alleges that Mades "was motivated to terminate Plaintiff's employment as a result of [her] decision to exercise her rights under the First Amendment to the U.S. Constitution to free speech and to petition the government." (Compl. ¶ 36.) Specifically, Plaintiff claims that Mades "deprived Plaintiff of her property interest in her job because she complained about his conduct to the Governor, two U.S. senators and to the Maryland Attorney General and his staff." (*Id.* ¶ 36, Ex. D.)

■ In *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court held that a public school teacher could not be fired in retaliation for exercising her First Amendment right to criticize the school board and superintendent in a letter to a newspaper. In reaching its conclusion, the Court noted that there must be a balance "between the interests of [a government employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an em-

ployer, in promoting the efficiency of the public services it performs through its employees." *Id.* The Court found that the teacher's comments were in the realm of public concern and, therefore, protected by the First Amendment. *Id.* at 569–70, 88 S.Ct. 1731. Furthermore, the Supreme Court has clarified that "[t]he First Amendment's guarantee of freedom of speech protects government employees from termination *because of* their speech on matters of public concern." *Bd. of County Comm'rs v. Umbehr,* 518 U.S. 668, 675, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (citation omitted). Thus, "[t]o prevail, an employee must prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination." (*Id.*)

■ In his Motion for Summary Judgment, Mades argues that he was "wholly unaware of Plaintiff's complaints prior to the termination of her employment." (Mades Mem. Supp. Summ. J. 1 (citing Mades Dep. 182:11–15, 183:2–9).) Thus, he contends, none of her complaints to U.S. Senators Mikulski and Sarbanes and Maryland officials were "a substantial or motivating factor in the termination." McGrath–Malott argues, however, that there is sufficient evidence to create a genuine issue of material fact. She points to the fact that in Mades's notes regarding the October 6, 2003 meeting, he wrote that "she has made all these allegations." (*See* Pl.'s Mem. Opp'n Summ. J. Ex. 7.) Mades's notes also refer to her July 25, 2003 EEOC Charge of Discrimination, which Plaintiff argues was "plain vanilla" and did not provide much detail at that time. (*Id.* at 39.) Because the EEOC Charge lacked detail, Plaintiff infers that Mades must have been aware of other "allegations" including her September 2003 letters to various government officials. Plaintiff also points to the fact that

after she complained to public officials in September of 2003, Jervis Finney of the Office of Legal Counsel to the Governor of Maryland authorized the Maryland Attorney General's Office to conduct an administrative investigation of Sheriff Mades. (McGrath–Malott Aff. ¶ 40.) Thus, she argues, Mades had to have been aware that she had complained about his conduct.

Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether Mades was aware of her complaints to Maryland officials and that they were a motivating factor in her termination. Accordingly, Mades's Motion for Summary Judgment is DENIED.

## II. The State and Sheriff Mullendore's Motion for Summary Judgment

### A. Count I—Title VII Sex Discrimination

In Count I, Plaintiff claims that she was subject to disparate treatment and a hostile work environment because of her sex, in violation of Title VII. Each claim will be addressed in turn.

### 1. Hostile Work Environment

■ First, Count I purports to assert a cause of action for hostile work environment or sexual harassment. In order to prove that she suffered from a " 'discriminatorily hostile or abusive work environment,' " "the [Plaintiff] must demonstrate that the harassment was (1) unwelcome, (2) because of [her gender], (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) imputable to the employer." *E.E.O.C. v. Sunbelt Rentals, Inc.,* 521 F.3d 306 (4th Cir.2008). Plaintiff has put forth evidence that during the thirteen years of her employment with the Sheriff's Office, she was subject to "derogatory discriminatory sexist remarks and sexual harassment" by both Mades and Lt. Hafer.

(McGrath–Malott Aff. ¶ 13.) She notes, particularly, when Mades made comments about wanting to "fool around" with her and "grab [her] tits" and mentioned that his wife made him wear a chastity belt before getting in a car with McGrath–Malott. (*Id.*) The most egregious event, she claims, was at a May 22, 1998 dinner event when Mades put his hand up her shirt and attempted to touch her breasts while asking if she wanted to touch him. (*Id.*)

Defendants argue that all of these events occurred more than 300 days before Plaintiff filed her July 25, 2003 EEOC Charge of Discrimination. (Defs.' Mem. Supp. Summ. J. 31–32.) However, the Supreme Court has held that

> [a] hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice." ... It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. *Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment* may be considered by a court for the purposes of determining liability.

*Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (emphasis added); *see also Holland v. Wash. Homes, Inc.,* 487 F.3d 208, 219 (4th Cir.2007); *Gilliam v. S.C. Dep't of Juvenile Justice,* 474 F.3d 134, 140 (4th Cir.2007) ("[E]vidence of behavior occurring outside of the applicable limitations period can be used to support a plaintiff's hostile work environment claim."). In this case, there were certainly incidents occurring within that 300 days that a reasonable jury could find to be the most recent of a series of events collectively constituting a hostile work environment. For example,

on April 22, 2003, when McGrath–Malott went to Mades's office to drop off a written request that her transfer be delayed, and he was on the phone, Mades made a derogatory remark to the person on the other end of the phone about McGrath–Malott that "the only thing worse than a lawyer was someone studying to be one," in clear view of her. (McGrath–Malott Aff. ¶ 20.) He also made similar comments both to other employees criticizing McGrath–Malott's educational pursuits. (*Id.* ¶ 30.) There is evidence, as well, that Mades made comments about Plaintiff's relationships with two male employees and that he believed she could not handle the "stress" of working with the two men. (*See, e.g.,* Mades Dep. 131:4–10, 167:8–12.) Finally, each of the alleged adverse employment actions, discussed *infra*, that may have been motivated by sex discrimination could be the last event in a pattern of conduct falling within the 300–day time period before the EEOC Charge was filed.

 This Court holds that a reasonable jury could conclude that Plaintiff was subject to a hostile work environment on the basis of her gender. Accordingly, Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's hostile work environment claim in Count I.

## 2. Disparate Treatment

Plaintiff claims that the State and Sheriff Mullendore discriminated against her on the basis of her gender in violation of Title VII. Because McGrath–Malott has not produced any direct evidence of employment discrimination, she must satisfy the three-step burden-shifting test first articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, a plaintiff must present enough evidence to prove a *prima facie* case of discrimination. *Reeves v. Sanderson Plumbing Products,* 530 U.S.

133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Second, once the plaintiff establishes a *prima facie* case, the burden shifts to the defendants to produce evidence that the adverse employment actions were taken against the plaintiff "for a legitimate, nondiscriminatory reason." *Id.* at 142, 120 S.Ct. 2097 (citing *Tex. Dept. Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Third, the plaintiff is "afforded the 'opportunity to prove by a preponderance of evidence that the legitimate reasons offered by the defendant[s] were not [their] true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089). This framework applies to both sex discrimination and retaliation claims.

McGrath–Malott has identified three events in which she was treated differently than her male colleagues: she was not promoted when male colleagues were, she was not given the same modified work schedule and leave opportunities as male colleagues, and she was fired. (Compl. ¶¶ 7, 9–10.)

### a. *Prima Facie* Case of Failure to Promote

 As to the first allegation, in order to establish a *prima facie* case of failure to promote, McGrath–Malott must show that "(1) she is a member of a protected group, (2) she applied for the position in question, (3) she was qualified for that position, and (4) the defendants rejected her application under circumstances that give rise to an inference of unlawful discrimination." *Anderson v. Westinghouse Savannah River Co.,* 406 F.3d 248, 268 (4th Cir.2005). It is undisputed that Plaintiff is a member of a protected class as a woman and that she applied for the position of corporal in May of 2002. As to her qualifications and the reason for Dfc. Boyer being selected over her, Defendants

point to the promotional process results, in which Dfc. Boyer scored highest of the four applicants with 91.41 points and McGrath–Malott scored second place with 89.91 points. (Defs.' Mem. Supp. Summ. J. Ex. 4.) The third- and fourth-place applicants—both men—scored 76.88 and 73.29 points, respectively. (*Id.*) Defendants have not submitted any evidence to show that McGrath–Malott was *unqualified* for the position,[4] but rather they argue that Dfc. Boyer was more qualified based on the results of the examination. Both McGrath–Malott and Dfc. Boyer had the same score for the other two criteria for promotion—seniority and performance. (Defs.' Mem. Supp. Summ. J. Ex. 4.) In fact, those two scores combined (56.61 points) comprised over half of the total score received by each candidate. It was the examination scores—34.8 to Dfc. Boyer and 33.2 to McGrath–Malott—that resulted in the selection.

Plaintiff notes that the selection process was entirely subjective because Sheriff Mullendore—then a Captain—wrote and graded the exam himself. However, this in and of itself is insufficient to create a genuine issue of material fact such that a reasonable jury could find that she was not promoted because of her gender. This case primarily complains of Mades's conduct and there are very few allegations that then-Captain Mullendore harbored any kind of discriminatory animus towards McGrath–Malott. Accordingly, Plaintiff has failed to make a *prima facie* showing of discriminatory failure to promote, and Defendants' Motion for Summary Judgment is GRANTED as to this claim in Count I.

### b. *Prima Facie* Case of Denial of Modified Work Assignment

■ This Court has previously held that a *prima facie* case for denial of leave requires a showing that "(1) Defendant provided leave to its employees, (2) Plaintiff was eligible for leave; (3) Plaintiff applied for leave, and (4) Plaintiff was not granted leave under circumstances giving rise to an inference of [discrimination or] retaliation." *Gbenoba v. Montgomery County Dep't of Health & Human Servs.*, Civ. No. DKC–03–2231, 2005 WL 1490008, at *8, 2005 U.S. Dist. LEXIS 12327, at *21–22 (D.Md. June 23, 2005). This test is analogous to the instant case, in which Plaintiff essentially contends she was denied a modified work assignment in the Fall of 2003 despite the fact that other male colleagues were granted such requests.

It is undisputed that the Sheriff's Office permits employees to take a modified work assignment in the event they are temporarily unable to perform all of their duties. (*See, e.g.,* Pl.'s Mem. Opp'n Summ. J. Exs. 16–19.) It is also undisputed that McGrath–Malott applied for and was denied a modified work assignment in the Fall of 2003. Thus, the only issues are whether Plaintiff was eligible for a modified work assignment and whether her request was denied under circumstances giving rise to an inference of discrimination. These elements rely on some of the same facts and, therefore, can be discussed together.

Under General Order 31500.00, applicable to all Patrol and Judicial Personnel in the Sheriff's Office, employees like McGrath–Malott are permitted *"on a case-by-case basis,* to return to work, in a temporary modified work assignment, (for

---

**4.** Indeed, Plaintiff's April 2003 performance evaluation shows her performing slightly above expectations, with an average score of 3.44 out of 5.00. (Pl.'s Mem. Opp'n Summ. J. Ex. 30.)

a maximum of 90 calendar days), until they fully recover from their injury or illness." (Pl.'s Mem. Opp'n Summ. J. Ex. 12, § 31515.01 (emphasis in original).) The policy requires employees to submit documentation from their physicians, but either the Division of Human Resources or the Sheriff's Office may request further examination at the County's expense "when deemed necessary." (*Id.* § 31515.02.) An employee's position can only be held "open" for 180 days, after which the Sheriff may decide to terminate the employee. (*Id.* § 31515.05.)

The reasons Mades gave McGrath–Malott for denying her a modified work assignment were (1) that her doctors were unable to set a specific time after which she could return to a full-duty schedule and (2) that she would pose a safety risk by working under mental stress. (*See* Compl. Ex. E.) As to the first reason, Plaintiff points to the joint statement dated September 24, 2003, by her treating physician, Dr. Terri Sears–Nickens, and licensed social worker, Ronald Pike, indicating that she could, in fact, return to full work status after a finite period of four to six weeks—less than 90 days. (Pl.'s Mem. Opp'n Summ. J. Ex. 3.) Rather than accepting this medical information, as he had done with male deputies previously, McGrath–Malott argues that Mades questioned their diagnosis in a discriminatory manner by requiring to meet with them in person to discuss her case. However, Mades stated in his deposition that, unlike all previous requests he had seen by male employees for modified work assignments as a result of a physical injury, McGrath–Malott had "a mental health issue," and he believed that the two types of conditions should be treated differently. (Mades

Dep. 160:10–11, 162:15–16.) He reasoned that "[m]ental health, disease of the brain, whatever you want to call it, you know, it just … never goes away" and that safety was his utmost concern. (*Id.* at 167:1–3.) However, McGrath–Malott argues that this could not be his real reason because the Sheriff's Office policy does not distinguish between physical and mental conditions in addressing modified work assignments. (*See* Pl.'s Mem. Opp'n Summ. J. Ex. 12.) In addition, she argues, Mades had previously allowed male employees to take modified work assignments for more than 90 days, indicating his willingness to bend the rules set forth in General Order 31500.00 in their cases. (*Id.* at Exs. 19–22.)

As to the second stated reason why she was denied a modified work assignment, Plaintiff notes that Mades testified in his deposition that granting her a modified work assignment would mean he "was going to bring her back, give her a gun, have her husband still there carrying a gun, an ex-boyfriend carrying a gun…." (Mades Dep. 167:8–12.)[5] He also commented "[i]s it in my department's best interest to let her walk and not run? This woman carries a gun. I can't prevent her from getting into a more stressful situation in the work environment such as she left Harsh, married Mallot [sic], she was in Cancun on a honeymoon…." (*Id.* at 131:4–10.) In other words, Plaintiff argues, Mades "was making a discriminatory assumption that the one female of the three would not be able to handle the situation." (Pl.'s Mem. Opp'n Summ. J. 9.) She further notes that Mades made no attempt to require any of the three individuals to turn in their guns, so he could not have been too concerned about their or the public's safety. (*Id.* at

---

**5.** Plaintiff used to date another Sheriff's Office employee, Roy Marsh, and later married

Dfc. William Malott.

11.) Thus, Plaintiff argues, any concerns Mades articulated about public safety were simply another way of saying she, as a woman, would not be able to handle the work environment if she returned on light duty.

This Court holds that Plaintiff has forecast sufficient evidence to create genuine issues of material fact as to whether she was eligible for a modified work assignment and did not receive it under circumstances giving rise to an inference of discrimination.

### c. *Prima Facie* Case of Discriminatory Discharge

■ As to the claim that she was fired because of her gender, McGrath–Malott must show that (1) she is a member of a protected class, (2) she was fired, (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of her discharge, and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. *Holland v. Wash. Homes, Inc.,* 487 F.3d 208, 214 (4th Cir.2007). It is undisputed that the first two elements are met, because Plaintiff is a woman and she was discharged from her position as Deputy Sheriff on October 28, 2003.

■ As to the third element, there does not appear to be any dispute that Plaintiff's work was satisfactory. Indeed, her April 2003 work evaluation shows that she was performing slightly above expectations, with an average score of 3.44 out of 5.00 and she had been commended for her success in serving summonses and warrants. (Pl.'s Mem. Opp'n Summ. J. Ex. 30; McGrath–Malott Aff. ¶ 10.) Rather, Mades's letter of termination cited McGrath–Malott's excessive leave and inability to return to work as the primary reason behind his decision to terminate

her employment. (Compl. Ex. B.) However, he acknowledged at his deposition that McGrath–Malott had not violated any leave policies and that he never questioned her use of sick leave because "she had a doctor's slip." (Mades Dep. 86:17–87:4.) He also conceded that he could have required her to be seen by a County-approved physician before making a decision as to her ability to return to work on a modified work assignment but that he did not choose to do so. (*Id.* at 91:5–13.) Thus, Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether she was performing at a level that met her employer's expectations.

■ As to the fourth and final element, this Court could not find in the parties' submissions whether McGrath–Malott's position remained open or was filled by a similarly qualified man. The parties did not even mention this element of the *prima facie* test. The United States Court of Appeals for the Fourth Circuit has held that the fourth prong of the *prima facie* case of discriminatory discharge need not be shown in all cases, such as when "the plaintiff can make out a *prima facie* case without showing replacement by someone outside the protected class." *See, e.g., Miles v. Dell,* 429 F.3d 480, 485 (4th Cir. 2005.) This Court holds that Plaintiff need not prove that her position was filled by a man or left open in order to make out a *prima facie* case.

Accordingly, McGrath–Malott has satisfied the *prima facie* case of discriminatory discharge.

### d. Defendants' Legitimate, Nondiscriminatory Reasons

Because Plaintiff has satisfied her burdens of stating *prima facie* cases of discriminatory denial of a modified work assignment and termination, the burden now

shifts back to the Defendants to articulate a legitimate, nondiscriminatory reason for taking these actions.

■ As to the denial of modified work assignment, Defendants contend, as stated in the letters sent to McGrath–Malott on October 15, 2003, and October 28, 2003, that her request for a modified work assignment was denied and she was fired, because Mades "was unsure when, if ever, she would be able to perform the essential functions of a law enforcement officer." (Defs.' Mem. Supp. Summ. J. 36.) This is a reasonable, nondiscriminatory reason for both adverse employment actions, and the burden now shifts back to Plaintiff to present evidence that this reason was in fact pretext for discrimination.

#### e. Pretext

■ Plaintiff points to numerous pieces of evidence why Defendants' articulated reason is merely pretextual, only a few of which will be highlighted here. First, she points to the history of conduct, particularly on the part of then-Sheriff Mades, in which comments and overtures of a sexual nature were made towards her. (*See* McGrath–Malott Aff. ¶¶ 13–14.) Second, she notes that Mades brought up her personal relationships in his deposition on multiple occasions, even suggesting that she would not be able to handle a work environment in which her former boyfriend and husband worked even though he expressed no concerns about the two men's abilities to work together. (*See, e.g.,* Mades Dep. 131: 4–10, 167:8–12.) Third, she points to instances where male colleagues were granted modified work assignments for periods up to and even exceeding both the official 90–day and the unofficial 180–day policy without requiring follow-up meetings with doctors. (*See*

McGrath–Malott Aff. ¶¶ 38, 46; Pl.'s Mem. Opp'n Summ. J. Exs. 16–22.) Finally, she notes that the decision to fire her could not have been justified if her request for modified work assignment had been granted, because it was that decision that rendered her incapable of working as expected. (*See* McGrath–Malott Aff. ¶ 46.)

Plaintiff has forecast sufficient evidence to create a genuine issue of material fact such that a reasonable jury could find that Defendants' proffered reasons for denying her a modified work assignment and terminating her employment were merely pretextual for sex discrimination. Accordingly, Defendants' Motion for Summary Judgment is DENIED as to the discriminatory denial of a modified work assignment and discharge claims in Count I.

### B. Count II—Title VII Retaliation

■ In Count II, Plaintiff claims that she was retaliated against for filing an EEOC Charge and complaining about discriminatory practices in the Sheriff's Office to several public officials. The same *McDonnell Douglas* framework discussed *supra* in the context of McGrath–Malott's disparate treatment applies to her retaliation claims as well. A *prima facie* case of retaliation requires a showing that (1) that she engaged in a protected activity, (2) that her employer took an employment action against her that a reasonable employee would have found materially adverse, and (3) that there was a causal connection between the protected activity and the adverse employment action. *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 298 (4th Cir.2004) (en banc).[6]

---

**6.** The failure to promote McGrath–Malott in December of 2002, discussed *supra* in the

context of sex discrimination in Count I, could not form the basis of a claim for retalia-

As to the first element, Plaintiff clearly engaged in a protected activity when she filed an EEOC Charge in July of 2003 and when she wrote to public officials in September of 2003 concerning what she believed was a discriminatory work environment. As to the second element, termination is clearly an adverse employment action. Furthermore, in *Burlington Northern*, the Supreme Court expanded the scope of those actions considered "adverse" for the purposes of Title VII retaliation claims, thus, the denial of a modified work assignment could dissuade a reasonable employee from engaging in protected activities. Therefore, this Court holds that the denial of a modified work assignment is also an adverse employment action in satisfaction of the second element.

Finally, as to the third element, both this Court and the United States Court of Appeals for the Fourth Circuit have held that proximity in time between the protected activity and the adverse employment action may be sufficient to establish the causation requirement. *See Causey v. Balog*, 162 F.3d 795, 803 (4th Cir.1998) (finding the thirteen-month interval between the plaintiff's charge of discrimination and termination was "too long to establish causation absent other evidence of retaliation"); *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir.1998) ("A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action ... ne-gates any inference that a causal connection exists between the two."); *Elries v. Denny's, Inc.*, 179 F.Supp.2d 590, 599 (D.Md.2002).

In this case, Plaintiff filed her Charge of Discrimination with the EEOC on July 25, 2003 and subsequently sent letters to government officials on September 17, 2003. Her September 17, 2003 request for a modified work assignment was denied by Mades on October 15, 2003, and she was fired on October 28, 2003. McGrath–Malott's Charge of Discrimination was filed approximately three months before the adverse employment actions were taken against her. However, at the October 6, 2003 meeting with Dr. Sears–Nickens and Mr. Pike, both Mades and Dee Hawbacker referenced McGrath–Malott's EEOC Charge in their notes, so the issue was clearly still on their minds. (Pl.'s Mem. Opp'n Summ. J. Exs. 6–7.) In addition, the September 17, 2003 letters to the two U.S. Senators for Maryland and other government officials resulted in an investigation into Mades and the Sheriff's Office that month. Thus, there is sufficient evidence of a causal link between Plaintiff's involvement in protected activities and the subsequent adverse employment actions taken against her to satisfy the third element of the *prima facie* case of retaliation.

The Defendants' legitimate, nondiscriminatory reasons articulated *supra* in the context of McGrath–Malott's claims for sex discrimination apply to her claims of

---

tion, because it occurred before she filed her July 25, 2003 Charge of Discrimination. Count II also alleges that Mades transferred McGrath–Malott in April of 2003 "from the Child Support Warrant division to courtroom duty in the Judicial division against her wishes and in retaliation for her use of sick leave and because she would not go along with his sexual advances." (Compl. ¶ 19.) Usage of sick leave does not constitute a "protected activity" within the meaning of Title

VII, so McGrath–Malott could not have been retaliated against for it. To the extent Plaintiff claims she was retaliated against for rejecting Mades's sexual advances, Defendant aptly notes that those events occurred many years prior to her transfer, rebutting any inference that they motivated Mades's decision to transfer her. Thus, Plaintiff cannot show that she was transferred between divisions in retaliation for any protected activity.

retaliation. Thus, she has the burden of showing that these reasons were pretextual for retaliation. As discussed above in the context of Mades's Motion for Summary Judgment, Mades denies having any knowledge that Plaintiff had complained about him to government officials before he made the decisions to deny her a modified work assignment and terminate her employment in October of 2003. (Mades Mem. Supp. Summ. J. 1 (citing Mades Dep. 182:11–15, 183:2–9).) However, this Court held that Plaintiff had presented sufficient evidence to create a genuine issue of material fact as to whether he was in fact aware of those letters and whether they motivated his decision to fire her. In addition, it is clear from Mades's notes regarding the October 6, 2003 meeting that he was aware of her EEOC Charge of Discrimination at the time he was making the decisions. Accordingly, this Court holds that Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether she was denied a modified work assignment and terminated in retaliation for filing the July 25, 2003 EEOC Charge of Discrimination and complaining to government officials in September of 2003.

## CONCLUSION

For the reasons stated above, the State's and Sheriff Mullendore's Motion for Summary Judgment is GRANTED in part and DENIED in part. Specifically, the Defendants' Motion for Summary Judgment is GRANTED as to the discriminatory failure to promote claim in Count I, but DENIED as to all remaining claims in Counts I and II. In addition, Mades's Motion for Summary Judgment on Count III is DENIED. A separate Order follows.

## ORDER

For the reasons stated in the foregoing Memorandum Opinion, IT IS this 23rd day of June, 2008, HEREBY ORDERED that

a. Defendant Charles Mades's Motion for Summary Judgment (Paper No. 64) is DENIED;

b. The Motion for Summary Judgment filed by Defendants State of Maryland and Douglas Mullendore (Paper No. 65) is GRANTED in part and DENIED in part;

 i. Defendants' Motion is GRANTED as to the discriminatory failure to promote claim in Count I;

 ii. Defendants' Motion is DENIED as to all other claims set forth in Counts I and II; and

c. The Clerk of the Court transmit copies of this Order and the accompanying Memorandum Opinion to counsel of record.